Last but not least, really the final case today is Nessa Reisley v. Universal Navigation Inc. Thank you. Thank you, Joy. Counsel, I understand that for the appellees, the argument will be split eight minutes by Universal Navigation, three minutes by AH Capital Management, and one minute Uniswap Foundation. Thank you. Thank you. Attorney Serratella? Correct. You may proceed. Well, it's afternoon now, so good afternoon, your honors. May it please the court, James Serratella on behalf of Appellants. I just want to start by briefly stating what this appeal concerns. It concerns whether plaintiffs have sufficiently pleaded defendants' violations of federal securities laws resulting from their creation of a cryptoasset exchange in New York that they operate and control. Defendants have referred to this exchange as the Uniswap Exchange or the Uniswap Protocol. There are various different names they use for it. And for background on the defendants, they are all for-profit companies that developed the Uniswap Protocol to make money for themselves. And for some additional background on the Uniswap Protocol, as of today, trading by – I looked at their website last night. The court can take judicial notice of this. As of today, trading on the Uniswap Protocol has eclipsed $2 trillion in volume. The average daily trading on the protocol is $1 billion. Tens of thousands of tokens are launched on this protocol, and most of them anonymously. And the record – this is in the complaint, and in the record it's at A-298. At least 97 percent of them are fraudulent. And what's at issue here are individuals who were victims of such fraud. And I want to start with one of the federal statutes at issue in this case, which is Section 12A1 of the Securities Act. And the obvious place to start is that there were two cases that were decided on appeal before this court this year, as this court is aware. One of them was Williams v. Binance in March of this year, and one of them was Olander v. Coinbase in April of this year. And I think it's pretty fair to say that those two decisions put the issue to rest whether the claims here could survive a motion to dismiss. Both were very similar in the sense that they concerned cryptoasset trading platforms that were alleged to be statutory sellers, one of which was a so-called centralized exchange, and the other of which was a so-called decentralized exchange. And like there, similar here, there were detailed allegations in the complaint, or the amended complaint, I should say, how all of these defendants are statutory sellers and pass title through creating, controlling, and maintaining the protocol. But in the Oberlander case, Oberlander v. Coinbase, this court held that, affirmed a finding that they were not sellers, didn't address whether cryptocurrency is a security, and skipped to the privity issues, and whether the defendants here were the sellers. How does Oberlander help you? It hurts your appeal. And the other case you mentioned really dealt with, didn't really address the issue that we're dealing with here. I mean, that addressed whether there was, the challenge there was to the international aspect of the trade. So it's very different. It seems like Oberlander really dealt with the issue here, and I recognize that there it was a centralized exchange. Here it appears to be decentralized. And so I don't see how Oberlander helps your case. Your Honor, I believe you may be referring to the Exchange Act claims in Oberlander where the court held.  Right. But I'm only talking about the Securities Act claims, where the court did hold that those were adequately pleaded. Well, yeah, but that's because there was a question about the user agreement in that case, and whether the user agreement affirmatively said or did not say that the exchange there would actually hold title to the coins. That's a different fact here. You're not, that wasn't claimed here. Do you have something in writing that says in this case that any of these defendants actually held title to the fraudulent cryptocurrency that was being exchanged? So under PINTER it's passing title. And yes, we do. And it's in, if you look at the diagram on page 8 of the opening brief, and this diagram has been in many different filings in the record, these tokens are all held in what's called the Uniswap pool. Right. But that doesn't tell me, I'm looking at the diagram, that doesn't tell me they hold title, right, in the decentralized exchange. Right. But decentralized by whose standards? What does that even mean? Well, you have the burden of proof. Right. So it's your, it's the standard this Court applies. But Judge Kahn, that's a misnomer. And there are detailed allegations regarding centralization in our complaint. And in the papers, the Court needs to look no further than defendants' own statements. And if you look at page 14 of our opening brief, and there's a site on page 26, footnote 15, Chris Dixon, who's general partner of Andreessen, and actually was on a YouTube video talking with Mark Andreessen himself, the founder of Andreessen Horowitz, he says, quote, Uniswap created the token. The token controls the protocol. It's effectively, by having a token, you own part of the protocol. But that's their token, right, the one they created. Right. You're not claiming that was fraudulent. No. Okay. So what I'm trying to understand is the fact that they create an exchange, a platform, where they allow people, and they create a program that allows people to trade. What gives them title to those, that currency, that cryptocurrency, those coins that you claim were fraudulent? So those are being held in a pool. I understand the argument of the pool. Right. But beyond there being a pool, what gives the defendants' title to them? Well, that gives them custody and control. I think that's the key factor here. And who actually owns it at that point? Isn't the seller and the purchaser the ones that control whether they choose to put the coin in the pool and whether they choose to purchase? So the issuer does place the tokens in the pool, but they're held by Uniswap and the defendants, or controlled by them at least. And I don't want to lose sight of the Exchange Act claims, because putting aside the seller, the statutory seller, there is no question that plaintiffs have pleaded they're an exchange. For what we're just discussing right here, there's no question that there's privity by their own statements, by the studies that have been conducted, that we cite to in the record. There were independent studies that say that these decentralized exchanges, supposedly, are highly centralized. They are controlled by who owns the tokens underlying the governance. That's what Chris Dixon said. That's what their general counsel said. And their arguments to this court and below completely contradict their own witnesses or own people's statements. They're coming into court and saying, oh, we don't control it, and they don't cite to anything in the record that actually supports that. They ignore the record, which shows control, not just their statements, but the pleadings regarding how these smart contracts operate. And they even tried to argue below. I think they've abandoned the argument that smart contracts are not contracts in the legal sense, and they keep quoting snippets of what a smart contract is. How did the district court get it wrong? Where did the district court go wrong? So the district court ignored allegations and went into a fact-finding exercise on a motion to dismiss. It took what the defendants were saying. It ignored all the allegations that I'm discussing here today that's brief. There's no way around that. Those statements are well pleaded. Those allegations, rather, are well pleaded. They have to be taken as true in a motion to dismiss. And also the court made various statements in the opinion that says, well, I'm hesitant to hold anyone liable under the securities laws because I don't know if they stretch that far to regulate this behavior. Well, the court's decisions in Oberlander and in the Binance case made clear now, which came out after this decision, that, yes, the securities laws do stretch to cover this behavior. Well, wait a minute. Didn't the court in Oberlander skip over the issue of whether this is securities and whether registration is required? So that's not at issue on this appeal. Okay. They've conceded that we've pleaded that there are securities for this appeal. Okay. It assumes, assuming it's a security without deciding. Yes. Okay. That's different than saying it is a security and it should be regulated. Let me be more clear. We're talking about a private cause of action. I'm just talking about whether we've pleaded a violation of securities laws. I'm not opining as to whether there's been a ruling on these tokens being securities.  We obviously believe they are. They believe they're not. That will be litigated at another time. So, but on this issue of the district court getting it wrong, the district court also made a finding that, supposedly, the smart contracts at issue in this case are the smart contracts that underlie the tokens. That's not what we pleaded. In fact, we've made it clear there are these router contracts, these core contracts, that all interact with the trader, our plaintiffs, that are trading in this pool. What defendant's argument really comes down to is, and they say this unabashedly in their papers, that this platform, this protocol operates on its own. We can't stop it. It's completely autonomous. Well, their own statements contradict that. Our pleadings contradict that. They don't get to litigate the merits of the case at this stage. That's what they're trying to do. That was improper for the district court to accept those statements. You can't do that on a motion to dismiss. And so on the Exchange Act claims, there is privity because the users are interacting with defendants through these pools that they control. It can't be that these things operate by themselves. They even have a business license for someone who wants to use the protocol. The court tried to differentiate the interface from the protocol. I think that distinction doesn't matter on this motion. And here's why. The interface is certainly 100 percent controlled by Uniswap. They have delisted tokens that they thought might have been considered securities. They didn't. They say in their papers, well, some users may use the interface. That is patently false. Nearly all users use the interface. They know that. We've pleaded that. Our plaintiffs all use the interface. Without the interface, there's no gateway into this protocol. They could shut the interface down like that. And this router contract that we've pleaded as part of the protocol, that is housed on Uniswap servers. You cannot get around that. They absolutely control this operation. Counsel, unless my colleagues have questions, you're about four minutes over. And you have reserved, however, your time for rebuttal, which is three minutes. Thank you. Thank you, Your Honors. Good afternoon. I'm Elliot Greenfield of Dubois and Plimpton on behalf of Universal Navigation, Inc., which I'll refer to as LABS, and Hayden Adams, who is LABS' CEO. As Judge Fela concluded, this case is really an attempt by plaintiffs to hold LABS, which is a software developer, liable for the alleged misuse of its software by third parties. That's not a viable claim under the federal securities laws. Nowhere in the amended complaint do plaintiffs allege any facts indicating that LABS ever had possession, custody, control, title, or any other ownership interest over any of the tokens at issue here. They don't plead a contract with LABS, and they don't plead that LABS was a statutory seller of the tokens. Instead, throughout the briefing and as you've heard here today, plaintiffs rely on conclusory assertions that are unsupported by any well-pleaded facts, and they rely on legal conclusions, none of which are entitled to the presumption of truth. The user agreement that was at issue in the Oberlander case, there is no user agreement here? Is there anything in the record to suggest that LABS or Uniswap, not when it comes to their own coin that they developed, their own token they developed, but with respect to the other tokens being traded on the platform, is there anything in the record to suggest that LABS is not the owner or holds control or title to any of those tokens when they're put in the pool? Sure. So to answer your first question, there's no user agreement at issue here. There's no user agreement that's been alleged. And so they've alleged kind of taking two approaches to trying to allege a contract here for purposes of the 29B, Section 29B claim. One is to say in conclusory fashion that every trade by its nature constitutes a separate contract. Judge Vela concluded, you know, that was completely conclusory, and this Court did the same thing in the Oberlander case. I won't quote it, but, you know, said the same thing. There's no non-conclusory. Your opponent is claiming that they've alleged this is a centralized exchange as opposed to a decentralized. What's your response to that? There's just no facts to back that up. I think there's a distinction here. A centralized exchange along the lines of Coinbase, the issue there was that Coinbase was alleged to take custody of all deposited assets, hold it in a centralized wallet, and the allegation is that plaintiffs were trading with Coinbase. So, you know, the question there is does custody get you the title? I don't think it does, but that's not an issue here because there's no allegation on the protocol that Labs ever has custody of the assets. The assets, as Mr. Cerutello said, are deposited into a liquidity pool that is a smart contract existing on the blockchain. Labs plays no role in that at all. They have no control over those liquidity pools. They have no custody of the assets. They're held by this liquidity pool, the smart contract on the blockchain. The issuers or somebody else creates the liquidity pool for a particular pair, deposits the tokens into the liquidity pool, and then other users, including the plaintiffs here, come along and they interact with the liquidity pool to exchange one token for another. Labs absolutely plays no part in that whatsoever. There's not even custody. There's certainly not title. And the allegations about centralized control all relate to the UNI token and the governance rights that go along with that. But those governance rights are strictly limited, and it's not about controlling tokens on the protocol. It's about for the next versions of the protocol that are launched over time. We're in version three now. The complaint mainly talks about version two. What changes are we going to make in the next version that's launched? That's the type of control that the UNI token allows. And a lot of people own the UNI token. So there's not a—as I said, each transaction does not constitute a contract. And then they point to the smart contracts. We do not abandon our argument that a smart contract is not necessarily a legal contract. You have to plead all the elements of the legal contract. Smart contracts are software. But to the extent that any of the smart contracts could be considered a legal contract, there's no allegation that Labs, the developer of the underlying computer code, would be a party to that contract. Your claim is the party to the smart contract is the seller and the purchaser, and the exchange is just a platform. Yes, it's software that allows parties to exchange tokens with each other. So there's people who are— How do you think that—I'm going to mispronounce the case, but Banan case, not the Oberlin, the other case.  Yeah, Binance. How does that impact this case, if at all, in your view? I think not at all. One of the questions there was extraterritoriality. And it's a kind of a bizarre case where the defendant was claiming not to exist anywhere. And so kind of complicated extraterritoriality questions. And there's a statute of limitations decision there, too. We do have a statute of limitations defense, which Judge Phelan didn't need to get to. But our arguments were perfectly aligned with the court's holding in the Binance case. And on the Section 29B case, which there was—that was alleged in the Binance case also. There's a footnote in the decision that says, we're not deciding whether or not that's adequately alleged. Where it's clear that the contract, the alleged contract there was the terms of service. And the court said, well, the terms of service do not require a violation of the Security Act because they don't require any action at all. But that wasn't decided by the district court. And it wasn't argued as an affirmative basis for affirmance before the Second Circuit. So the court didn't decide that. Can you just very briefly address the state claims under CAFA and whether the court committed error and whether we need to remand those for the court's assessment on the theory that the court would have original jurisdiction over those claims? Yes, we do not dispute that the court has jurisdiction over the state claims under CAFA. I think that, you know, there's—the state securities claims also have the same seller requirement. So the court could affirm dismissal of those. The other state claims, I believe it's the court's policy to send those to the district court for—in the first instance. Thank you, counsel. Unless there are further questions from colleagues, thank you. May it please the court, Samir Deghasan for the VC defendants. Plaintiff's claims against the VC defendants amount—well, boil down to the contention that by providing financial and technical assistance to a platform on which alleged securities violations occur, the VCs should be held liable as sellers in the case. That would constitute a breathtaking and unprecedented expansion of the securities laws and it lacks any grounding in text or precedent. And I do think one remarkable thing about both the briefing and the argument here has been how untethered it has been from the other side as to the actual legal requirements. So I just want to ground this a little bit in the Section 12 legal requirements. So Section—the Section 12 solicitation claim, this is a narrow cause of action for rescission by a buyer against the seller of the securities that he purchased from them. As Pinter says, it has to be akin to a buyer-seller relationship that's like traditional contractual privity. The solicitation aspect, you know, widens that a little bit, but it still has to be anchored in the statutory text, which says, to the person purchasing such security from him. And the such security language means the allegations have to be security-specific. So what does that mean? It means at least three requirements, as we explain in our brief. The defendant has to make a statement directed at producing a sale of the specific security at issue. The statement has to have caused the plaintiff's purchase of that security. And the defendant has to have a financial motive to solicit the sale of the specific security at issue. And here what we have as to the VC defendants is the statement is not by the VC defendants. The only statements they allege are ones by Hayden and by Labs that generally tout the platform itself. So there's no allegation of a security-specific statement whatsoever. So it fails at the threshold for that reason. There's no allegation of causation. In fact, remarkably, they never allege they even saw this alleged solicitation. And there's no security-specific allegations to financial motive. All of the financial motives are incredibly broad and untethered. And so the allegations in this case ultimately come down to just sort of a policy argument that someone should be responsible. But that's not what this case is about. This is about the specific private rights of action that exist under the statute. And those private rights of action are for rescission. They were designed, as the Supreme Court said in Pinter, to govern the relationship between a buyer and seller. And certainly, as we've heard, Labs is not in any sense a seller. But absolutely, the VC defendants cannot be sellers, cannot be in any kind of contractual relationship. And all of these terms, you know, privacy, title, these are legal conclusions. This Court has held that a number of times. You can't just say they have title, he has privacy, we have privacy. You have to actually plead the facts that underlie that. And they never plead the facts that underlie any of those things. Thank you. Thank you, counsel.  May it please the Court. Jason Gottlieb from Morrison Cohen. I rise separately on behalf of the Independent Uniswap Foundation, a Delaware non-profit corporation. The amended complaint did not allege that the founding… You said you do or don't speak for Uniswap Labs. I do not speak for Uniswap Labs. That is a separate organization. The Uniswap Foundation is a separate company, and that is why I rise today. The complaint doesn't allege that the foundation itself did anything to harm anyone. The foundation was only sued as an alleged alter ego of Universal Navigation, Inc. Plaintiffs in that amended complaint failed to meet the very high bar to plead that alter ego theory. The dismissal was proper for all the reasons my co-counsel stated in the brief sent today. This Court can additionally affirm that dismissal of the foundation for failure to plead that alter ego status. This issue is not reached by the judge below, by the Court below, but it is important, particularly if the Court were to consider remand on state law issues or anything else. If the panel has any questions, I'm happy to field those, and if not, I'm happy to rest on my papers. Thank you. Thank you. Thank you, counsel. Attorney Serritelli, you've reserved three minutes for rebuttal. Thank you. Thank you, Judge. I want to address a few things Mr. Greenfield mentioned, and I think this statement that keeps being made that Uniswap Labs, which its original Twitter handle was Uniswap Exchange and they renamed it, they keep saying they're a software developer or a software company, and if you look at page five of their brief, their opposition, they make this statement and they cite to paragraph 52 of the amended complaint for that proposition, and this is throughout the record. Paragraph 52 says no such thing. It makes very plainly clear that we're alleging they're an exchange allowing the transfer or transaction of what we allege to be securities. They also say that they're just an open source protocol, and they cite to paragraph, I believe, 52 or, I'm sorry. They say they're an open source protocol. It's A55, paragraph 121. We do not allege that. We allege that there's a business source license that you have to pay if you want to copy the protocol, and they've actually licensed it to other companies. So there are a lot of statements like this that they're making that the district court adopted that are not grounded in the record or reality, and one of them is very plainly the smart contracts that underlie the trades and the protocol are not with the issuers. They are Uniswap and the defendant smart contracts that they drafted, that they maintained, and they control. As a matter of fact, they make updates to these contracts periodically. They're about to launch version 4 of the protocol. So for the VC defendants to get up here and say that they have no involvement in any of this, that really strains fragility and is not supported by the allegations. And if you want to talk about privity for a minute, what everyone is ignoring, and they tried to brief this and say it's all autonomous because they know they have a real problem because if a trader wants to interact through the interface with the protocol, and if the protocol doesn't do what it's supposed to do, well, that's not following the contract that it's supposed to follow. So of course there's privity. It can't just be that we're interacting with a machine that no one controls. Their whole argument centers around it, and that's why the governance is so foundational to this case. And this is in our amended complaint. There were independent studies done that said this exchange is centralized. It is controlled, likely by Andreessen, who owns probably the most tokens. Even Chris Dixon and the GC for Andreessen said whoever controls the UNI token controls the protocol. So it can't be there's no privity with anyone. Of course there's privity. It's not what a software company that's just, I'm sorry, software that's just flying around in the ether. That doesn't make any sense. And we've pleaded adequately in our complaint that there are violations of both the Securities Act and the Exchange Act. At the very least, there is an exchange here. Thank you, counsel. Thank you to all counsel.